FILED

08/07/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2020

**IN RE NAKAYIA S. ET AL.**

**Appeal from the Juvenile Court for Jackson County**
**No. 2017-JV-11     Tiffany Gentry Gipson, Judge**

———————————————————

**No. M2019-00644-COA-R3-PT**

———————————————————

This is the second appeal by a father of the termination of his parental rights to his two minor children. The trial court determined that termination of the father's rights was in the best interest of the children after finding he failed to manifest an ability and willingness to assume custody of the children and abandoned them by engaging in conduct that exhibited a wanton disregard for their welfare. In the first appeal, we vacated the judgment of the trial court because its findings of fact failed to comply with the mandate in Tenn. Code Ann. § 36-1-113(k) and remanded for the trial court to make additional findings of fact on two grounds—abandonment by wanton disregard and failure to manifest an ability and willingness to assume custody of or financial responsibility for the children—and on whether termination of the father's parental rights was in the children's best interests *See In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *5–6 (Tenn. Ct. App. Sept. 18, 2018). In this appeal, the father contends the court improperly based its decision on one child's out of court allegations of abuse, and he asserts that he manifested ability and willingness to assume custody by complying with the permanency plan requirements. We have determined that the child's statements were properly admitted under Tennessee Rule of Evidence 803, and the preponderance of the evidence is not against the trial court's findings, which amount to clear and convincing evidence of the elements necessary to terminate the father's parental rights. Accordingly, we affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Kayla Collins Cantrell, Gainsboro, Tennessee, for the appellant, Eric S.[1]

Amber L. Seymour, Assistant Attorney General, and Andree Kahn Blumstein, Solicitor General, Nashville, Tennessee, for the appellees, Tennessee Department of Children's Services, and Veronica S.

**OPINION**

I. BACKGROUND

In July 2015, Nevaeh and Nakayia S. ("the Children") were placed in the custody of the Tennessee Department of Children's Services ("DCS") after their mother, Veronica S. ("Mother"),[2] was arrested for driving under the influence with the Children in the car. At the time, Father was incarcerated in Minnesota for domestic assault. Seven months later, Father was released from prison and paroled to Indiana. The same month, the Children were declared dependent and neglected and placed with a foster family.

Father's parole requirements prohibited him from leaving Indiana, but he promptly contacted DCS and requested the Children be placed with him. Thereafter, Father participated with DCS in developing two family-permanency plans for the Children. Among other requirements, Father was required to obtain insurance, resolve outstanding legal matters, and follow DCS's recommendations regarding visitation. DCS recommended that Father not have visitation with the Children, but the case manager advised Father that he could hire an attorney to contest the recommendation.

After conferring with Father, DCS requested approval to place the Children with Father under the Interstate Compact on the Placement of Children ("ICPC"), Tenn. Code Ann. §§ 37-4-201 to -207. However, Indiana denied the request because Father had an outstanding arrest warrant in Putnam County, Tennessee, for theft under $1000. Thus, when Father's parole ended in September 2016, Father returned to Putnam County and began serving a four-month sentence.

In December 2016, while Father was incarcerated in Putnam County, DCS developed a third permanency plan without Father's participation or agreement. The third plan included two new action steps for Father to complete: (1) submit to and follow the

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] The trial court also terminated the parental rights of Veronica S., the Children's mother; she did not appeal the termination of her parental rights.

recommendations of a psychological and parenting assessment; and (2) obtain and maintain safe, appropriate housing.

In February 2017, Father was released from jail and met with DCS case worker, Sarah Halliburton. Father told Ms. Halliburton he did not have the money to get a new apartment because he was unemployed. Ms. Halliburton explained that there were affordable housing opportunities in Indiana and offered to help him look for housing in Tennessee. After meeting with Ms. Halliburton, Father requested a second ICPC evaluation and then returned to Indiana. The same month, DCS filed its petition to terminate Father's parental rights.

For reasons unexplained by the record, the third permanency plan was not approved by the juvenile court until April 2017—just over three months before the scheduled final hearing in the termination proceedings. Around the same time, Indiana denied the second ICPC request because Father was living in a one-bedroom apartment with another person.

In early May 2017, Father obtained health insurance; in mid-June he had a psychiatric evaluation. Two weeks later, Father called DCS caseworker Malissa Mayberry and reported that he obtained housing and was living by himself. Father requested a third ICPC evaluation, but Ms. Mayberry said that a team meeting would need to take place before requesting a third ICPC evaluation. Ms. Mayberry also requested a copy of Father's lease. By the time of the final hearing, Father had not provided a copy of the lease, and DCS had not submitted a third ICPC request.

## II. PROCEEDINGS IN THE TRIAL COURT PRIOR TO THE FIRST APPEAL

The case went to trial on July 18, 2017. DCS presented the testimony of the Children's foster mother, Lisa M., who testified that the Children had been living with her family for nearly two years. Lisa testified that her family had bonded with the Children and were willing to adopt them. This testimony was corroborated by Ms. Halliburton, who stated that the Children had bonded with Lisa and referred to her as "mommy."

On the other hand, Ms. Halliburton testified that Father had not seen the Children in over two years, and Ms. Mayberry testified that she never heard the Children inquire about Father. When the Children were told that they had a letter from "dad," Neveah thought it was from the foster father.

In January 2017, Nevaeh was referred to Amanda Wentz, a Licensed Masters Social Worker, for behavioral issues related to trauma. Ms. Wentz testified that Nevaeh suffered from, *inter alia*, inattentiveness, emotional sensitivity, and nightmares. Her symptoms were diagnosed as Attention-Deficit-Hyperactivity Disorder ("ADHD") and unspecified anxiety disorder.

Ms. Wentz testified that Neveah disclosed that Mother and Father would fight when they lived together. On one occasion, Neveah drew a picture of Father and told Ms. Wentz that Father would "show out his body." Without being prompted, Neveah stated that Father was mean and had slapped her. In addition to behavioral therapy, Ms. Mayberry testified that Neveah received occupational therapy and speech therapy, as well as physical therapy for a hip injury.

Based on the foregoing and other evidence, the juvenile court entered an order on July 25, 2017, terminating Father's parental rights to the Children on five grounds: (1) abandonment by willful failure to support; (2) abandonment by willful failure to visit; (3) substantial noncompliance with the permanency plan; (4) engaging in conduct exhibiting a wanton disregard for the welfare of the Children; and (5) failure to manifest an ability and willingness to assume custody.

III. FIRST APPEAL

In the first appeal, DCS conceded the grounds of abandonment by failure to visit and failure to support. *In re Nakayia S.*, 2018 WL 4462651, at *3. Thus, our analysis was confined to the three remaining grounds: (1) substantial noncompliance with the permanency plan; (2) abandonment by wanton disregard; and (3) failure to manifest an ability and willingness to assume legal and physical custody. *Id*.

As for noncompliance with the permanency plan, we determined that the additional requirements in the third plan were "unreasonable" because they were not approved by the juvenile court until April 2017:

> Because Father did not agree to the third permanency plan, Father had no obligation to complete the requirements until the juvenile court ratified it on April 4, 2017. Thus, we find it was unreasonable to expect Father to comply with these requirements before the final hearing. Consequently, Father's noncompliance with the housing and psychological-assessment requirements is irrelevant to the substantial noncompliance determination. For this reason, we disagree with the juvenile court's finding that clear and convincing evidence existed for terminating Father's parental rights for substantial noncompliance with the permanency plan's statement of responsibilities.

*Id*. at *5.

Additionally, we determined that our review of the remaining grounds, as well as the children's best interests, were precluded by a lack of findings of fact in the final order. *Id*. Thus, we remanded the case for the trial court to make additional findings of fact and conclusions of law as required by Tenn. Code Ann. § 36-1-113(k). *Id*.

## IV. FINAL JUDGMENT FOLLOWING REMAND

On March 12, 2019, the juvenile court entered its revised final judgment. The court concluded that Father failed to manifest an ability and willingness to assume custody of or financial responsibility for the Children based on these findings:

By his being incarcerated, then not having the ability to come to Tennessee, then failing to notify the Department eventually of his intention to come to Tennessee, failing to notify them when he arrived, and failing to take any substantive action pertaining [to] the children while here, he clearly failed to manifest an ability and willingness to assume legal and physical custody of his minor children.

. . .

. . . . [Father] was told how to inquire about affordable housing opportunities in Indiana, and he was provided the resources for such an inquiry, but [Father] simply did not secure it. He was told of affordable housing options here in Tennessee, and was told of the different programs that were offered by the Cookeville Housing Authority.

[Father] availed himself of neither of these options, failed to secure housing for he [sic] and his minor children, and offered no explanation as to why he would not. By his failure to do so, he yet again, clearly failed to manifest an ability and willingness to assume legal and physical custody of his minor children.

. . . . [Father] made no further inquires [sic] after being advised that the children's therapist did not recommend visits, nor did he take any legal action to secure visitation, either supervised or therapeutic, despite being told by DCS that he would need to contact his attorney in order to do so.

[H]ad [Father] appeared at a single court hearing, or even made the request via his telephone appearances, he could have made his concerns about visitation or custody known, if he did in fact have such concerns, and the Court could have addressed these barriers to visitation. Alas, he did not. Therefore, once again, he clearly failed to manifest an ability and willingness to assume legal and physical custody of his minor children.

In addition, the trial court found a substantial risk of harm would exist if the Children were placed with Father:

Neveah has special needs, physical therapy and speech therapy to address educational delays, and still suffers from inattentiveness, emotional

- 5 -

sensitivity, nightmares, and related issues. She is also receiving mental health treatment to address her behaviors and stressors. . . . .

.    .    .

[I]t was revealed that during treatment that Neveah disclosed prior abuse or neglect by [M]other and [Father]. She would describe how they would allegedly fight with one another in her presence . . . .

Also, during treatment, Neveah drew a picture that included [Father] and disclosed to Ms. Wentz that [Father] would "show out his body" and stated "Eric is mean" and that "Eric slapped me."

.    .    .

In this matter, although [Father] indicated to the case manager that he had obtained suitable housing some months after the termination petition was filed, he was unable to provide the requested necessary confirmation. To assume that he was being truthful is mere speculation . . . . In addition, he took no action to indicate that even if he did, [in] fact, obtain "a physically sound structure," that the children would not be subjected to any further domestic trauma, or that he would be in a position to understand the particular needs of his children, and ensure that these needs would be met through the necessary therapy and counseling sessions they required. Again, he has not shown that he has the ability and willingness to provide either a physically sound structure, nor any indication that he could protect and parent his children in the event that he did.

For all of these reasons, it is this Court's opinion that placing these children in the physical and legal custody of [Father] would undoubtedly and unquestionably pose a risk of substantial harm to the physical or psychological welfare of these children.

The trial court then found DCS proved by clear and convincing evidence that Father's conduct exhibited a wanton disregard for the Children's welfare because he engaged in a pattern of physical abuse:

By engaging in physical violence toward the children's mother, and Neveah herself, and then ultimately serving an extended period of incarceration for domestic abuse, there is clear and convincing evidence that [Father] refused to show concern for his children's mental or physical health, and there exists a broader pattern of conduct that renders him unfit or poses a risk of substantial harm to the welfare of the children.

- 6 -

Finally, the trial court found that termination of Father's parental rights was in the Children's best interests based on a number of factors, including Father's failure to make an adjustment of circumstances, the lack of a bond between Father and the Children, and the significant bond between the Children and their foster family. The trial court's specific findings on this issue include:

1. [Father] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in his home. As the Court has already elaborated above, [Father] has been unable, at any point since the inception of these proceedings, to confirm the existence of housing that would be adequate to accommodate the minor children, either by way of an appropriate physical home that could be examined through the ICPC process, by way of a plan that would keep the children safe from displays of physical and mental abuse, or by way of a plan that would meet the therapeutic needs of the children.

2. [Father] has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. [Father] has not made changes in his conduct or circumstances that would make it safe for the children to go home. He refuses to take the necessary or meaningful actions that would demonstrate that he was able to provide an environment that could meet the minor children's needs.

3. [Father] has not maintained regular visitation or other contact with the children. [Father] has not laid eyes on his children at all since their being in custody, and for an undetermined amount of time prior to their being in custody. [Father] was provided the recommendation of the counselor that did not recommend visitation, but did not inquire further as to therapeutic visitation, or any method of removing the barriers to his visitation. There were no motions filed before the Court requesting any visitation, as to either Nakayia or Neveah. He did not stay in Tennessee to work with their counselor, nor did he provide any insight as to how he would meet their needs in Indiana.

4. A meaningful relationship between Nevaeh and Nakayia [] has not otherwise been established between the children and [Father]. The children do not indicate they miss him, nor do they ask about him. Quite simply, [they] do not have a bond with their father.

5. A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical

condition. Navaeh has special needs, physical therapy and speech therapy to address educational delays. She is also receiving mental health treatment to address her behaviors and stressors. Nakayia has receive[d] mental health therapy to address her anxiety. The environment they are currently in is conducive to their continued progress and development. To change their caretaker to someone who has not seen them since 2015 [is] likely [to] have a devastating impact on their emotional and psychological wellbeing.

6. [Father] has made lifestyle choices that prevent him from being able to parent these children or to provide a home for these children. [Father] has consistently been in and out of jail, and as such [has] been unable to provide a safe and stable environment that would meet the needs of these children.

7. The children are placed in a foster home that wishes to adopt the children and have established a strong bond with the foster parents. The foster parents are called "mom and dad" by the children, and engage in daily routines that provide normalcy and stability. The foster parents also ensure that the physical, emotional and mental health needs of the children are met.

8. The children's mental health counselor has opined that it is in the children's best interest to establish permanency for the children as soon as possible through adoption.

9. The children need to be released from the stigma of being foster children. They have been in foster care long enough, and this Court finds they are desperately in need of their forever home.

This appeal followed.

Father contends the trial court erred in finding that grounds existed for terminating his rights and that terminating his parental rights is in the Children's best interests.[3]

---

[3] Father also presents a third issue—whether the evidence preponderates against the trial court's ruling that DCS made reasonable efforts to reunite him with the Children. Because "the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis," *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015), we will consider this issue in our analysis of the Children's best interests.

STANDARD OF REVIEW

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence," and "[i]t produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *See id*.

## ANALYSIS

### I. GROUNDS FOR TERMINATION

The trial court found that two grounds for terminating Father's parental rights had been established: (1) failure to manifest an ability and willingness to assume custody of the Children, *see* Tenn. Code Ann. § 36-1-113(g)(14); and (2) abandonment by engaging in conduct that exhibited a wanton disregard for the Children's welfare, *see id*. § 102(1)(A)(iv)(c) and § 113(g)(1). We will address each in turn.

### A. Failure to Manifest Ability and Willingness to Assume Custody

Under Tenn. Code Ann. § 36-1-113(g)(14), a parent's rights may be terminated if the parent (1) "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child;" and (2) "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Each element must be proven by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018).

1. Ability and Willingness

The juvenile court based its ruling on two principal findings: (1) Father did not seek court-ordered visitation with the Children; and (2) Father failed to secure suitable housing, despite DCS's efforts to assist him. Father does not dispute these facts, but he contends that he manifested ability and willingness to assume custody of the Children by complying with the permanency plan requirements.

In the first appeal, we interpreted Tenn. Code Ann. § 36-1-113(g)(14) as requiring DCS to prove that Father failed to manifest an ability **and** failed to manifest a willingness to assume custody of the Children. *See In re Nakayia S.*, 2018 WL 4462651, at *5 (citing *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018)). Since then, this court has consistently interpreted § 113(g)(14) as requiring the petitioner to prove the parent failed to manifest an ability **or** failed to manifest a willingness to assume custody or financial responsibility. *See, e.g.*, *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *7 (Tenn. Ct. App. Apr. 23, 2020) (citing *In re Amynn K.*, No. 2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018)). We found this approach to be more consistent with the Tennessee Supreme Court's interpretation of nearly identical language in another provision of the same statute. *In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *7 (Tenn. Ct. App. Mar. 31, 2020) (citing *In re Bernard T.*, 319 S.W.3d 586, 604 (Tenn. 2010)). Even more recently, this court applied a consistent interpretation of the meaning of the statute that was, however, based on the determination that the statute was ambiguous, which afforded the court the opportunity to consider legislative intent. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *1 (Tenn. Ct. App. July 22, 2020). As this court explained in *Braelyn*,

> [t]he legislative history concerning the enactment of section 36-1-113(g)(h) is highly relevant. Not only did Ms. Collins testify as to the exact dispute at issue in this case, her testimony was expressly described as for the purpose of establishing the legislative intent. Thus, although the language ultimately used in section 36-1-113(g)(14) "lack[ed] precision," *Thompson*, 38 S.W.3d at 512, its meaning can be readily derived from a review of the enactment's legislative history. And that legislative history clearly shows that the intent of the statute was to provide a ground for termination if the petitioner proves "**either inability or unwillingness**" under section 36-1-113(g)(14). Any ambiguity in the statute is therefore resolved by the legislative history in favor of the interpretation furthered by *Amynn K.* and its progeny.

*Id*. at \*17 (emphasis added). Accordingly, we will consider whether DCS proved by clear and convincing evidence that Father failed to manifest an ability to assume custody of the Children **or** failed to manifest a willingness to assume custody of the Children.[4]

We have determined that the facts clearly and convincingly establish that Father failed to manifest an ability to assume custody of the Children.[5] Father was incarcerated from the time the Children were placed into DCS custody in July 2015 until his release in January 2016. After being released, Father was confined to Indiana on probation. During that time, Indiana denied the transfer of the Children under the ICPC due to Father's outstanding warrant in Putnam County. After his parole, Father was incarcerated in Tennessee until February 2017. Upon his release, Father chose to return to Indiana—which meant that a second ICPC request was necessary. That request was denied because Father had inadequate housing. There was evidence that Father obtained new housing shortly before trial. However, the fact remained that Father still needed approval from Indiana before he could assume custody of the Children. In summary, Father was physically and legally unable to assume custody of the Children from July 2015 through the date of the final hearing.

Based on the foregoing, we have determined that the preponderance of the evidence is not against the trial court's findings, which, together, constitute clear and convincing evidence that Father failed to manifest an ability to assume legal and physical custody of the Children.

## 2. Risk of Substantial Harm

Having found clear and convincing evidence that Father failed to manifest an ability to assume legal and physical custody of the Children, we must next consider whether there was clear and convincing evidence of the second element, that "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical

---

[4] After the filing of the notice of appeal and briefs in this matter, the Tennessee Supreme Court granted a Rule 11 application for permission to appeal in *In re Neveah M*., No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at \*1 (Tenn. Ct. App. Mar. 4, 2020), *appeal granted* (June 15, 2020). In that case this court held, in pertinent part, that "[i]f a party proves only the 'ability' criterion or the 'willingness' criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights." *Id*. at \*16 (citing *In re Ayden S.*, 2018 WL 2447044, at \*7). We surmise that the Supreme Court took the case to resolve a conflict of opinion within the Court of Appeals on the interpretation of this ground for termination of parental rights.

[5] Because the trial court based its decision on Father's ability to assume custody, we have not addressed Father's contention that DCS failed to prove he failed to manifest an ability and/or willingness to assume financial responsibility for the Children.

or psychological welfare of the [Children]." Tenn. Code Ann. § 36-1-113(g)(14). Substantial harm "connotes a real hazard or danger that is not minor, trivial, or insignificant," and "it indicates that the harm must be more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). In other words, "[w]hile the harm need not be inevitable, it must be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.*

The juvenile court found placing the Children with Father would create a risk of substantial harm to the Children's physical or psychological welfare because of Nevaeh's special needs and Father's history of domestic violence.[6] Father does not dispute that Nevaeh has special needs, but he argues that the trial court should not have placed weight on Nevaeh's statements concerning domestic violence because Ms. Wentz admitted that she never asked Neveah "whether or not she specifically remembered [abuse] at the hands of [Father] or whether it was told to her by another person."

In parental termination proceedings, out of court statements by a child regarding abuse or neglect are admissible unless the "circumstances indicate lack of trustworthiness." Tenn. R. Evid. 803(25), cmt. "[T]he determination of trustworthiness is a matter for the trial court to decide and [its] decision will not be disturbed on appeal unless there is a showing of abuse of discretion." *State, Dept. of Human Services v. Purcell*, 955 S.W.2d 607, 609 (Tenn. Ct. App. 1997).

Here, Father had an opportunity to cross-examine Ms. Wentz about the context of Neveah's statements. Ms. Wentz testified that Neveah made the statement spontaneously, and the trial court found Ms. Wentz's testimony was credible. Further, Neveah's statement was corroborated by Father's admission to DCS that he was incarcerated in relation to a charge of domestic assault—a fact that Father does not challenge on appeal. Thus, we find Ms. Wentz's failure to probe Neveah further on the source of her knowledge does not undermine the trial court's finding on this issue.

Based on the foregoing, we agree that the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence that placing the Children in Father's legal and physical custody would pose a risk of substantial harm to their physical or psychological welfare.

---

[6] The court also found a risk of substantial harm based on the impact of removing the Children from their long-term foster parents. But, as Father correctly points out, "[r]emoval of a child from foster parents that the child has been living with for a long time and may have bonded with does not constitute substantial harm." *See In re Alysia S.*, 460 S.W.3d 536, 576–77 (Tenn. Ct. App. 2014).

## B. Abandonment by Wanton Disregard

Under Tenn. Code Ann. § 36-1-113(g)(1), a parent's rights may be terminated if a parent "abandoned" the child. In cases where the parent was incarcerated when termination proceedings were instituted, or for all or part of the immediately preceding four months, "abandonment" includes engaging "in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *See id*. § 102(1)(A)(iv)(c) (2016 Pub. Acts, c. 919, §§ 1, 2, eff. July 1, 2016, to June 30, 2018). Thus, it is not the incarceration itself that constitutes wanton disregard but the conduct before incarceration. *See In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005) (stating that incarceration alone does not constitute wanton disregard). A parent's incarceration is simply "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

Conduct exhibiting a wanton disregard for a child's welfare has been described as "the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child," *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015), and is found when "a parent's poor judgment and bad acts . . . affect the children," *In re William B.*, No. M2014-01762-COA-R3-PT, 2015 WL 3647928, at *3 (Tenn. Ct. App. June 11, 2015) (citation omitted).

In this case, the trial court found that Father exhibited a wanton disregard for the Children's welfare before incarceration by engaging in physical violence, domestic abuse, toward Mother and Neveah, as well as other illegal or unreasonable acts. The trial court found that Father admitted he was incarcerated in Minnesota on charges related to domestic assault, and Father does not contest this finding on appeal. Father, however, again relies on Ms. Wentz's alleged failure to confirm the trustworthiness of Neveah's statement by not asking whether Neveah "specifically remembered [abuse] at the hands of [Father] or whether it was told to her by another person." As stated, we find no merit in this argument.

Based on the foregoing, we have determined that the preponderance of the evidence is not against the trial court's findings, which, taken together, establish clear and convincing evidence that Father exhibited a wanton disregard for the Children's welfare before his incarceration.

## II. THE CHILDREN'S BEST INTERESTS

Having found the existence of at least one ground for terminating Father's parental rights, we must consider whether DCS presented "clear and convincing evidence that terminating the parent's rights [was] in the best interests of the [Children]." *In re Bernard T.*, 319 S.W.3d at 606; Tenn. Code Ann. § 36-1-113(c). While the combined weight of the evidence must meet the clear and convincing standard, facts considered in the best-interest analysis need be proven only "by a preponderance of the evidence, not by clear and

- 13 -

convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. "When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

The best-interest analysis "is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i)," *In re Bernard T.*, 319 S.W.3d at 606, but not a rote examination of each factor followed by "a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.*

Tennessee Code Annotated § 36-1-113(i) includes nine factors for courts to consider "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child," three of which particularly apply to this case:

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition; [and]
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household . . . .

*Id*. Additionally, "the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis." *In re Kaliyah S.*, 455 S.W.3d at 555.

While the bond between a child and the child's foster parents is inappropriate to consider when determining whether a ground for termination exists, *see In re Alysia S.*, 460 S.W.3d at 576–77, the bond may be considered in the best-interest analysis, *see, e.g.*, *In re Heaven L.F.*, 311 S.W.3d 435, 441 (Tenn. Ct. App. 2010) ("The record showed that the children were in a stable, loving environment in their current foster home, that the foster family wished to adopt them, and that the children were doing well there." (citing Tenn. Code Ann. § 36-1-113(i)(5)).

Father challenges the trial court's finding that termination of his parental rights is in the Children's best interests on several fronts. He contends the evidence preponderates

- 14 -

against the court's finding that DCS made reasonable efforts to reunite Father with the Children because the 2017 permanency plan requirements were unreasonable. We find Father's argument is inapposite. Whether the permanency plan requirements were "reasonable" is not the same as whether DCS made "reasonable efforts."[7] The trial court based its decision on these findings:

> In this matter, the Case Manager for the Department provided [Father] with her contact information and the state "on call" contact information; provided him information pertaining to local transportation and housing; provided him with resources in the state of Indiana to contact about affordable housing; provided a letter from the child's therapist stating contact between the parent and child was not within the child's best interest; attempted to gather [Father]'s criminal charges and convictions and medical records; obtained releases of information from [Father] to receive information from his probation officer; and attempted to maintain contact with [Father] by sending him letters, text messages, and phone calls when he was out of jail[.]

The preponderance of the evidence is not against the trial court's findings. Accordingly, we affirm the trial court's determination that DCS made reasonable efforts.

Father also contends the evidence preponderates against the trial court's findings because Father "completed most, if not everything, asked of him by DCS in order to create a safe and stable home for his children." The trial court based its decision on, *inter alia*, the following findings:

> 4. A meaningful relationship between Nevaeh and Nakayia . . . has not otherwise been established between the children and [Father]. The children do not indicate they miss him, nor do they ask about him. Quite simply, [they] do not have a bond with their father.

> 5. A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical condition. Navaeh has special needs, physical therapy and speech therapy to address educational delays. She is also receiving mental health treatment to address her behaviors and stressors. Nakayia has receive[d] mental health therapy to address her anxiety. The environment they are currently in is conducive to their continued progress and development. To change their caretaker to someone who has not seen them since 2015

---

[7] In the first appeal, we found two requirements in the 2017 permanency plan were "unreasonable" because the plan wasn't ratified until two months after the petition was filed. That decision, however, was limited to the specific elements required to prove substantial noncompliance with a permanency plan. *See In re Nakayia S.*, 2018 WL 4462651, at *3.

[is] likely [to] have a devastating impact on their emotional and psychological wellbeing.

.    .    .

7. The children are placed in a foster home that wishes to adopt the children and have established a strong bond with the foster parents. The foster parents are called "mom and dad" by the children, and engage in daily routines that provide normalcy and stability. The foster parents also ensure that the physical, emotional and mental health needs of the children are met.

8. The children's mental health counselor has opined that it is in the children's best interest to establish permanency for the children as soon as possible through adoption.

9. The children need to be released from the stigma of being foster children. They have been in foster care long enough, and this Court finds they are desperately in need of their forever home.

*See* Tenn. Code Ann. §§ 36-1-113(i)(3) to (5).

The Children have not seen Father since 2015 and have no meaningful relationship with him. We recognize that the permanency plan limited Father's ability to communicate with the Children; however, "[f]rom the child's point of view, the reasons for the lack of interaction matter little." *White v. Moody*, 171 S.W.3d at 194. It is also undisputed that the Children have lived with the same foster family since 2016 and have developed a strong bond. Accordingly, the preponderance of the evidence is not against the trial court's determination that a change of caretaker and physical environment is likely to have a negative effect on the Children's welfare.

Accordingly, we find the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence that termination of Father's parental rights is in the Children's best interests.

## IN CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Eric S.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 16 -